STATE OF VERMONT

| | |
|---|---|
| SUPERIOR COURT<br>Vermont Unit | ENVIRONMENTAL DIVISION<br>Docket Nos. 153-9-10 Vtec,<br>9-1-11 Vtec and 28-2-12 Vtec |

| | |
|---|---|
| Town of Westford,<br>    Plaintiff<br><br>    v.<br><br>Linda Mathieu,<br>    Defendant (153-9-10 Vtec)<br>**********************************<br>Town of Westford,<br>    Plaintiff<br><br>    v.<br><br>Richard Mathieu,<br>    Defendant (9-1-11 Vtec)<br>**********************************<br>Town of Westford,<br>    Plaintiff<br><br>    v.<br><br>Mathieu Properties, LLC<br>    Defendant (28-2-12 Vtec) | **Index to Merits Decision** |

| Section | Page No. |
|---|---|
| Findings of Fact | 2 |
|   I.  Overview | 2 |
|   II.  Notices of Violation that are the Subject of this Action | 5 |
|     a.  NOV Issued to Linda Mathieu | 5 |
|     b.  NOVs Issued to Richard Mathieu | 6 |
|     c.  NOV Issued to Mathieu Properties, LLC | 7 |
|   III.  Efforts Surrounding Zoning Violations | 7 |
|     a.  Unpermitted Access Road over Linda's Lot | 7 |
|     b.  Enforcement Action Concerning NOV Issued to Linda | 12 |
|     c.  Zoning Violations by Richard Mathieu | 12 |
|       i.  Occupancy and Use of Barn on Richard's Lot | 13 |
|       ii.  Use of Access Way over Linda's Lot | 16 |
|       iii.  Use of Access Way over Bus Lot | 17 |
|       iv.  Use of Unpermitted Access Way Instead of Mathieu Road | 19 |
|     d.  Enforcement Action Concerning First and Second NOVs Issued to Richard | 20 |

| Section | Page No. |
|---|---|
| e. Zoning Violations by Mathieu Properties | 20 |
| f. Enforcement Action Concerning NOV Issued to Mathieu Properties | 21 |
| VI. Legal Fees Incurred by the Town | 22 |
| Conclusions of Law | 24 |
| I. Overview | 24 |
| II. Finality of NOVs Issued to Each Defendant | 24 |
| III. Applicability of the Equitable Estoppel Doctrine | 26 |
| IV. Defendants' Assertion that Town Waived its Claims | 28 |
| V. Fines to be Imposed against Each Defendant | 29 |
| a. As to Mr. and Mrs. Mathieu | 31 |
| b. As to Mr. Mathieu alone | 31 |
| c. As to Mr. Mathieu and Mathieu Properties | 32 |
| VI. Aggravating and Mitigating Factors; Final Determinations | 32 |
| a. As to Mr. and Mrs. Mathieu | 32 |
| b. As to Mr. Mathieu alone | 36 |
| i. Use of Barn Prior to Obtaining CO | 36 |
| ii. Failure to use Mathieu Road for Modular Home Access | 37 |
| c. As to Mr. Mathieu and Mathieu Properties | 38 |
| Conclusion | 39 |

STATE OF VERMONT

SUPERIOR COURT
Vermont Unit

ENVIRONMENTAL DIVISION
Docket Nos. 153-9-10 Vtec
9-1-11 Vtec
28-2-12 Vtec

Town of Westford,
    Plaintiff

v.

Linda Mathieu,
    Defendant (153-9-10 Vtec)
**********************************

Town of Westford,
    Plaintiff

v.

Richard Mathieu,
    Defendant (9-1-11 Vtec)
**********************************

Town of Westford,
    Plaintiff

v.

Mathieu Properties, LLC
    Defendant (28-2-12 Vtec)

**DECISION ON THE MERITS**

The Town of Westford ("Town") has sought to encourage and then compel Linda Mathieu, Richard Mathieu, and their Vermont limited liability company—Mathieu Properties, LLC ("Mathieu Properties")—to bring existing developments on three adjoining parcels of land into conformance with the Town of Westford Zoning Regulations. For their part, Mr. and Mrs. Mathieu have sought to bring their properties into conformance, although they did not set a rapid pace in responding to the Town's allegations of zoning violations. Nonetheless, by the time of trial, the Town agreed that the Mathieus had succeeded in curing all of the noticed zoning violations, albeit after some time had elapsed from when the Town gave formal notice to the Mathieus about their alleged zoning violations. In the interim, a great deal of animosity developed between the Mathieus, Town officials, and their respective legal counsel. Thus, by the time of trial, while the Mathieus did not dispute that they had caused zoning violations on

their properties and the Town conceded that the Mathieus had cured all zoning violations, the parties held wildly disparate opinions of what fines should be imposed as a consequence of these zoning violations. The level of fines is the principal legal issue left for this Court to address in this Decision on the Merits.

The Court conducted an evidentiary hearing on the legal issue of the appropriate level of fines to be imposed. The testimony and other evidence the parties presented consumed four days of trial time. Thereafter, at the parties' request and with some Court direction, the Court allowed the parties to present supplemental post-trial filings.

Linda Mathieu, Richard Mathieu, and Mathieu Properties (hereinafter collectively referred to where appropriate as either "Mathieus" or "Defendants"; otherwise referred to individually where appropriate) are represented in these coordinated proceedings by attorneys Claudine C. Safar and Courtney Butler. The Town of Westford is represented by attorneys Amanda S.E. Lafferty and David W. Rugh. No other parties have appeared in these proceedings.

Based upon the evidence presented at trial, including that which was put into context by the site visit that the Court conducted with the parties on the morning of the first day of trial, the Court renders the following Findings of Fact and Conclusions of Law, together with the Judgment Order that accompanies this Merits Decision.

**Findings of Fact**

I. **Overview**

1. The Mathieus own three properties that are adjacent to one another and located along three roadways: Vermont Route 128, Town Highway #2 (also known as the Westford-Milton Road), and a private roadway, known as Mathieu Road. The subject properties were previously held in the sole name of Richard Mathieu as part of a single 50± acre parcel; that parcel was subdivided to create the three parcels that are the subject of these coordinated enforcement cases, together with another parcel (described below in ¶ 2) that is not subject to these enforcement proceedings.

2. This fourth parcel (not a subject of these proceedings) was subdivided by Mr. Mathieu from the original parcel and conveyed to Mr. and Mrs. Mathieu's son, Casey. We hereinafter refer to that subdivided parcel as "Casey's Lot"; it is located along the northern boundary of the

remaining property. Casey's Lot and the remaining Mathieu properties are identified on the site map that is referenced in ¶ 7, below.

3. The Mathieu properties are located in the Agricultural, Forestry, and Rural Residential I and II Zoning Districts ("AFR1 District" and "AFR2 District") and the Water Resources Overlay Zoning District ("WRO District"). The Town zoning districts are more fully described and identified in the Town of Westford Zoning Regulations ("Regulations").

4. Richard Mathieu first purchased the original 50± acre property in the late 1980s. At some point the original 50± acres may have been transferred to Mr. and Mrs. Mathieu's joint names.

5. Mr. Mathieu established several businesses on a portion of his property: first a truck repair business and then a school bus repair and depot business.

6. Beginning in 2001, Mr. and Mrs. Mathieu decided to subdivide their property. The first subdivision permit was followed by multiple applications for permit amendments. Most of these subsequent permit amendment applications constituted "after-the-fact" permit applications, since Mr. and Mrs. Mathieu had undertaken development that did not conform to the original subdivision permits before receiving the permits to do so.

7. In the fall of 2001, Mr. and Mrs. Mathieu sought to create two lots from their remaining 31.5± acre property, with the first lot (to be known as Lot #1) to consist of approximately 21.2± acres and the second lot (to be known as Lot #1A) to consist of approximately 10.3± acres. The Town of Westford Planning Commission ("Planning Commission") approved this subdivision application on September 10, 2001; a copy of that subdivision approval was admitted at trial as Exhibit 6. Attached to Exhibit 6 is the subdivision plat that the Planning Commission relied upon in approving the Mathieus' 2001 subdivision application.

8. At the time of the 2001 subdivision, Lot #1A was undeveloped and was transferred into Mr. Mathieu's sole name. Lot #1A is hereinafter referred to as "Richard's Lot."

9. Mr. Mathieu subsequently allowed a modular home to be installed on Richard's Lot and allowed his brother, Lionel, to use the home as his residence.

10. In 2002, Mr. and Mrs. Mathieu decided to further subdivide Lot #1 (the 21.2± acre parcel) into two lots: the new Lot #1 would contain 10.1± acres and a new Lot #2 would contain the remaining 11.1± acres.

11. By a decision issued on August 14, 2002, the Planning Commission approved the Mathieus' additional two-lot subdivision; a copy of that decision, with attached subdivision plat, was admitted at trial as Exhibit 7.

12. The Mathieus thereafter transferred Lot #1 to Mathieu Properties, LLC, a limited liability company, which they wholly own and control. Lot #1 has road frontage on both Vermont Route 128 and the Westford-Milton Road.

13. At the time of this subdivision, Lot #1 contained a large commercial building and a large gravel parking area which Mr. Mathieu used to establish his truck and bus repair and school bus depot businesses. The access drive to these businesses begins on Route 128 and travels in a westerly direction to the commercial building and parking area. Lot #1 is hereinafter referred to as "the Bus Lot."

14. The Mathieus then conveyed Lot #2 to Linda Mathieu, to be held in her sole, individual name. Lot #2 adjoins Lot #1, with Lot #2 lying to the west of Lot #1. Lot #2 has road frontage solely on the Westford-Milton Road. The access for Lot #2, as approved in 2002 by the Planning Commission, travels from the Westford-Milton Road in a northerly direction, parallel and close to the western boundary for Lot #2. This access road is depicted on the subdivision plat within Exhibit 7.

15. Lot #2 is hereinafter referred to as "Linda's Lot."

16. After the 2002 subdivision, the Mathieus developed Linda's Lot with a single family residence, an accessory barn or garage, the identified access road, and on-site wastewater treatment and potable water supply systems.

17. While the Mathieu Lots were the subject of numerous other permit amendment applications, rejections, and approvals, the size and boundary configurations of Richard's Lot, Linda's Lot, and the Bus Lot have not materially changed since their initial creation in 2001 and 2002. These three lots, each of which is the subject of one of the coordinated enforcement proceedings here, are depicted on the subdivision plats attached to Exhibits 6 and 7.

18.     Mr. and Mrs. Mathieu have not occupied any of these three Lots as their residence; they reside on other property they own elsewhere in Town.

## II.     The Notices of Violation that are the Subject of this Action

19.     Prior to issuing the notices of alleged zoning violations that are the subject of these coordinated proceedings, the Town sent several warnings to Linda and Richard Mathieu that the activities on their respective properties constituted violations of the applicable zoning regulations.   Since the Town concedes that these prior warnings did not constitute formal notices of zoning violations, we do not specify them here, but rather reference them below, to the extent that we view these prior warnings and the Mathieus' responses to them as aggravating or mitigating factors in our determination of the appropriate penalties.

### a.   NOV Issued to Linda Mathieu

20.     By letter dated September 21, 2009, the Town of Westford Zoning Administrator ("the ZA") gave formal notice to Linda Mathieu that she had allowed a road to be constructed on her Lot without first receiving the necessary municipal permit in violation of the applicable Regulations and 24 V.S.A. § 4449(a)(1)–(a)(2).

21.     A copy of this notice of violation ("NOV") (hereinafter referred to as the "NOV issued to Linda") was admitted at trial as Exhibit 2.

22.     Trial testimony revealed that the circumstances concerning the private road constructed on Linda's Lot were largely undisputed.

23.     Richard Mathieu, with assistance from others, built the road as an unpermitted access way for a barn he built on Richard's Lot; Richard's Lot abutted the northern boundary of Linda's Lot.   The unpermitted access way initially travelled from the Westford-Milton Road along the driveway that served the single family residence on Linda's Lot.[1]   The unpermitted access way then continued from the end of the permitted driveway to the northerly boundary of Linda's Lot, on to Richard's Lot, and to the barn on Richard's Lot.

---

[1]   The driveway to the single family residence on Linda's Lot is depicted on the subdivision plat attached to Exhibit 7.

24. Neither Mr. Mathieu nor Mrs. Mathieu identified the unpermitted access way to Richard's barn in any of the permit applications or site maps that they submitted to the Town prior to beginning construction and use of the unpermitted access way.

25. The credible testimony also revealed that neither Mr. Mathieu nor Mrs. Mathieu offered a justification for why they built the access way over Linda's Lot without first receiving a permit authorizing either of them to do so.

26. Richard Mathieu acknowledged at trial that his wife, Linda, received the NOV issued to her by the ZA.

### b. NOVs Issued to Richard Mathieu

27. By letter dated January 25, 2010, the ZA gave formal notice to Richard Mathieu that he was occupying and/or using a recently-constructed barn on Richard's Lot without first receiving certificates of occupancy authorizing him to do so, all in violation of the applicable Regulations and 24 V.S.A. § 4449(a)(1)–(a)(2). A copy of this NOV was admitted at trial as Exhibit 3. We hereinafter refer to this NOV as the "First NOV issued to Richard."

28. Richard Mathieu did not offer any testimony at trial that he had applied for or received an occupancy certificate or other authority to occupy this barn as of the date of the January 2010 NOV.

29. By letter dated July 1, 2010, the ZA notified Richard Mathieu of the following additional zoning violations the ZA believed were occurring on Richard's Lot:

   a. Construction and use across the Bus Lot of an unpermitted driveway from the parking lot on the Bus Lot to the boundary with Richard's Lot and across that boundary to the modular home on Richard's Lot occupied by Richard's brother, Lionel. This is the same unpermitted driveway referenced in the NOV issued to Mathieu Properties and described in ¶¶ 33–36, below.

   b. Construction and use across Linda's Lot of an unpermitted private road that was being used to access the newly-constructed barn on Richard's Lot. This unpermitted access way is the same access way cited in the NOV issued to Linda and described in ¶¶ 20 and 23, above.

   c. Construction and use of an access other than Mathieu Road; use of Mathieu Road as the access way for the barn on Richard's Lot was a specific condition (condition #3) in the September 25, 2008 Planning Commission approval, as described in ¶¶ 71–72, below.

30. We hereinafter refer to the NOV issued by the ZA on July 10, 2010 as the "Second NOV issued to Richard."

31. The Mathieus did not offer any testimony at trial that they had permits or other authority to construct and use the access ways described in the Second NOV issued to Richard.

32. Richard Mathieu acknowledged that he received both of the NOVs that the ZA issued to him.

### c. NOV Issued to Mathieu Properties, LLC

33. By a separate letter also dated July 1, 2010, the ZA gave formal notice to Mathieu Properties that it had caused or allowed several violations of the applicable Regulations and 24 V.S.A. § 4449(a)(1)–(a)(2) to occur on the Bus Lot.

34. We hereinafter refer to this NOV issued by the ZA on July 1, 2010 as the "NOV issued to Mathieu Properties." A copy of this NOV was admitted at trial as Exhibit 5.

35. Richard Mathieu, on behalf of Mathieu Properties, LLC, acknowledged that he received the NOV issued to Mathieu Properties. Mr. Mathieu is the managing member of Mathieu Properties, LLC.

36. The NOV issued to Mathieu Properties specifically noted the following alleged zoning violations:

   a. Construction and use of the private access road over the Bus Lot to the residence on Richard's Lot;

   b. Use for vehicular access of the lawn between the parking area on the Bus Lot and the boundary shared with Richard's Lot; and

   c. Alteration or amendment of the site plan and final plat for the Bus Lot, without prior approval from the Westford Development Review Board ("DRB").

37. Richard Mathieu, on behalf of Mathieu Properties, LLC, acknowledged that the development and use of this portion of the Bus Lot was conducted without a permit or amendment of any existing permit or the site plan or final plat for the Bus Lot.

## III. Efforts Surrounding Zoning Violations

### a. Unpermitted Access Road over Linda's Lot

38. Sometime in June 2009, the ZA first advised Mr. and Mrs. Mathieu of his concern about the unpermitted access way from the end of the driveway on Linda's Lot to the barn on

Richard's Lot. By letter dated June 17, 2009, the ZA informed Richard Mathieu of his concerns. The ZA did not intend this letter to constitute a notice of alleged zoning violations. The ZA credibly testified at trial that he intended at the time of this initial informational letter to work with the Mathieus to cure the zoning violations. A copy of his June 17, 2009 letter was admitted at trial as Exhibit 14.

39. The June 14, 2009 warning letter suggested ways that the Mathieus could cure the alleged zoning violations, including (1) removing the unpermitted portion of the access road over Linda's Lot or (2) submitting an application for a permit to authorize the access road as constructed.

40. Initially, the Mathieus did not follow either of the ZA's suggestions, but rather continued to complete the construction of the unpermitted access road on Linda's Lot and thereafter use it without benefit of a permit.

41. On July 27, 2009, the Mathieus submitted an application for an as-built permit for the access road serving the barn on Richard's Lot, but then withdrew the application on August 20, 2009, before the DRB had an opportunity to conduct a hearing on that application. A copy of this first as-built application was admitted at trial as Exhibit 17.

42. When the Mathieus did not take measures to cure the zoning violations the ZA had warned about in his June 14, 2009 letter, the ZA issued the September 21, 2009 NOV to Linda.

43. The ZA was additionally concerned about the Mathieus' construction and use of the unpermitted access road to the barn because a portion of the unpermitted access road travelled near the septic system serving the residence on Linda's Lot. A permit had been issued for this septic system, but the ZA's examination of the unpermitted access road revealed that it could impact the operation of the septic system, especially in the winter months, due to the way that snow was plowed from the access way.

44. On September 21, 2009, the Town of Westford Health Officer ("Health Officer") issued a notice that the septic system on Linda's Lot was in violation of its septic permit and the applicable Town health regulations. See Exhibit 19.[2]

---

[2] Maurice Rathbun was then serving as both the Zoning Administrator and Health Officer. By the time of trial, Mr. Rathbun had retired from both positions, although the Town caused Mr. Rathbun to appear as a trial witness.

45. The Mathieus appealed the violation notice served upon Linda Mathieu by the Health Officer.

46. By decision issued December 3, 2009, the Town of Westford Selectboard ("Selectboard") denied the Mathieus' appeal of the health violation. The Mathieus chose not to seek review of the Selectboard's determination that the septic system on Linda's Lot constituted a violation of the health regulations.

47. The Mathieus ultimately applied for and received an amended state wastewater permit for the septic system installed on Linda's Lot. A copy of that state permit, issued on February 9, 2010, was admitted at trial as Exhibit 34.

48. The Mathieus also appealed the NOV issued to Linda to the DRB.

49. By decision issued on November 17, 2009, the DRB denied the Mathieus' appeal of the NOV issued to Linda. The Mathieus chose not to further appeal that NOV. Their decision not to further appeal the NOV issued to Linda was influenced in part by the DRB's representations at its October 28, 2009 hearing on the Mathieus' NOV appeal that the matter could be resolved by the Mathieus filing an application for the as-built unpermitted access road over Linda's Lot.

50. We do not find credible the Mathieus' representation that the DRB assured the Mathieus that the DRB would approve their as-built permit application, particularly since the Mathieus had yet to submit that application. Nonetheless, we find that the Mathieus' understanding, even if mistaken, contributed to their decision not to appeal the NOV decision to this Court. The Mathieus took the more practical route of focusing their efforts, albeit with some delays, on applying for and securing an as-built permit.

51. We find no credibility, however, in the Mathieus' claim that either the ZA, the DRB, or both, assured them that the Town would not prosecute the zoning violations and claims for fines if the Mathieus filed for this as-built permit.

52. On December 17, 2009, the Mathieus submitted a second application for a permit for the already constructed access road over Linda's Lot. A copy of that application was admitted at trial as Exhibit 26. The Mathieus, through their engineer, asked that the DRB delay any hearing on this second application, however, until they had obtained the necessary amended state wastewater permit for the septic system constructed on Linda's Lot.

53.    By decision issued June 2, 2010, the DRB denied the Mathieus' second application for approval of their as-built access road on Linda's lot. The DRB based its denial on a September 25, 2008 Planning Commission approval of Richard Mathieu's request for an increase in the building envelope on Richard's Lot (then known as Lot #1A), but directed that any structures built on Richard's Lot must be accessed by way of Mathieu Road. The DRB in 2010 therefore concluded that it should not authorize the alternate access over Linda's Lot.

54.    The Mathieus appealed the 2010 DRB denial to this Court, but later withdrew that appeal when the DRB approved their subsequent application, as reflected in ¶ 62, below. In re Mathieu Subdivision Permit Application, No. 108-7-10 Vtec (Vt. Super. Ct. Envtl. Div. Mar. 12, 2012).

55.    On June 24, 2010, the Mathieus submitted their third application for an as-built permit for the access road over Linda's Lot, but advised the DRB that they wished to pursue alternative routes to curing their zoning deficiencies. After consultation with Town officials, their engineer, and their attorney, the Mathieus determined that those alternative routes would not result in approval of the as-built access way to Richard's barn.[3]

56.    In the intervening time period, Richard Mathieu sought to determine whether the Vermont Agency of Transportation ("VTrans") had a preference or some advice on whether the unpermitted access way from the Westford-Milton Road was a more preferable access route to Richard's Lot than the access route from Mathieu Road.

57.    VTrans's perspective was helpful, although not germane to or lawfully binding upon the prior municipal permit determinations concerning access for Richard's Lot.

58.    Mr. Mathieu and his consultants coordinated on-site and follow-up office meetings with Town and VTrans officials on September 10, 2010. VTrans officials advised that it would be preferable for Richard's Lot to be accessed from the Westford-Milton Road, rather than from Route 128, over Mathieu Road. The VTrans officials expressed concerns about the curb cut on

---

[3] Much trial testimony was provided on these efforts, which included working to further subdivide Richard's Lot so that the barn would occupy a new, independent parcel. Some of the recollections testified to at trial were contradicted by other trial testimony, but we need not reconcile those contradictions, since we conclude that these alternative efforts were ultimately unsuccessful and that, after several months and much analysis by their advisors, the Mathieus returned to their efforts to obtain an as-built permit for the unpermitted access way over Linda's Lot without any reconfiguration of Richard's Lot.

Route 128 and the steepness of Mathieu Road. VTrans officials also expressed concern that because Mathieu Road already served as access for the adjacent Casey's Lot, the access for Richard's Lot would cause Mathieu Road to serve multiple properties, thereby requiring a VTrans highway access permit for the Route 128 curb cut.

59. On November 18, 2010, the Mathieus' engineer submitted on their behalf several applications and requests to remedy the zoning violations concerning the access way over Linda's Lot, including the following:

  a. An application concerning Linda's Lot to authorize the necessary upgrades to the existing access road that serves both the residence on Linda's Lot and uses on Richard's Lot;

  b. A request that the access over Linda's Lot also now serve as access for the modular home on Richard's Lot;

  c. An application concerning Richard's Lot to (1) authorize the access to the Richard's Lot barn and modular home over Linda's Lot and (2) close off the previously-approved access via Mathieu Road; and

  d. A confirmation that the barn on Richard's Lot would serve as an accessory structure to the modular home on Richard's Lot, then occupied by Richard's brother, Lionel.

60. These requests were outlined in a November 8, 2010 cover letter for the Mathieus' applications from their engineer, David W. Burke. A copy of Mr. Burke's November 8, 2010 cover letter was admitted at trial as Exhibit 53.

61. As a result of these requested permit amendments and the site changes that they entailed, the Mathieus were required to address stormwater flow and treatment issues and apply for and receive a state stormwater permit. The Mathieus received a stormwater discharge permit on June 3, 2011. See Exhibit 57 at 3, ¶ 12.

62. On August 31, 2011, the DRB approved the Mathieus' applications for amended permits concerning the access way over Linda's Lot to Richard's Lot. A copy of that approval, which contained a number of conditions, was admitted at trial as Exhibit 54.

63. The period of time during which the zoning violations existed on Linda's Lot, after the seven day cure period expired, totaled 702 days (i.e.: September 28, 2009 to August 31, 2011).

**b. Enforcement Action Concerning NOV Issued to Linda**

64. On September 20, 2010, the Town filed its complaint against Linda Mathieu, seeking both injunctive relief and the assessment of fines against Mrs. Mathieu as a consequence of the unappealed NOV issued to Linda.

65. Mrs. Mathieu filed her response to the Town's complaint on December 3, 2010 in which she denied many of the Town's substantive claims against her and asserted several affirmative defenses. Mrs. Mathieu's response included her denial of the Town's claim that she had failed to timely appeal the NOV issued to her and that the zoning violations alleged in the NOV had therefore become final.

66. As a consequence of Mrs. Mathieu's denials and affirmative defenses, the Town was compelled to conduct extensive pre-trial discovery and motion practice, thereby adding to the Town's expenses in this litigation.

67. On October 10, 2012, this Court denied Mrs. Mathieu's request for summary judgment that the Town should be precluded from prosecuting the NOV issued to Linda based on the doctrine of equitable estoppel. See Town of Westford v. L. Mathieu, No. 153-9-10 Vtec, slip op. at 3–4 (Vt. Super. Ct. Envtl. Div. Oct. 10, 2012) (Durkin, J.).

68. No credible facts were presented at trial that supported Mrs. Mathieu's factual representations in her summary judgment request on the equitable estoppel claim.

69. Also on October 10, 2010, this Court granted the Town's request for partial summary judgment on its claims that Mrs. Mathieu had committed the violations reflected in the NOV issued to her and that she had failed to timely appeal the NOV issued to her. Id. As a consequence of these rulings, the only legal issue remaining in Docket No. 153-9-10 Vtec became what fines, if any, should be assessed against Mrs. Mathieu.

**c. Zoning Violations by Richard Mathieu**

70. When Richard's Lot was first created through a subdivision in 2001 (see ¶¶ 7–8, above), Mr. Mathieu presented a building envelope for future development that he later determined would be too small for the development he planned.

71.     Mr. Mathieu therefore applied to expand the building envelope on his Lot. The Planning Commission approved that application on September 28, 2008. A copy of the Commission approval was admitted at trial as Exhibit 11.

72.     The Commission conditioned its approval upon several requirements, including that "[a]ll structures located on the subject parcel shall solely be accessed by Mathieu Road." Exhibit 11 at 2, ¶ 3.

### i.     Occupancy and Use of Barn on Richard's Lot (First NOV Issued to Richard)

73.     On November 5, 2008, the ZA approved[4] Mr. Mathieu's application for a permit to build a "shed" on Richard's Lot. A copy of the ZA's approval was admitted at trial as Exhibit 12. That approval specifically listed the proposed shed as being 9,600 square feet in size and stated its use as storage for "Hay + Haying Equipment."[5] Exhibit 12 at 1.

74.     Although not specifically stated in the application or permit (Exhibit 12), trial testimony confirmed that the proposed shed/barn was represented by Mr. Mathieu as an accessory structure on his Lot, to be used solely for agricultural purposes (i.e.: storage of hay and haying equipment) and as an accessory to the modular home on Richard's Lot that was then occupied by his brother, Lionel.

75.     Mr. Mathieu completed the construction of the proposed accessory barn sometime in 2009. Once construction was complete, he immediately began to use the barn to store various items of personal property; his use of the barn was not constrained to the storage of hay and haying equipment.

---

[4]  Mr. Mathieu originally submitted this building permit application on August 2, 2007. See Exhibit 12. The ZA initially denied that application the same day. Id. It appears that Mr. Mathieu's original 2007 application called for the proposed shed/barn to be located on the Bus Lot and that the ZA stated on the denial portion of the application form that the reason for his denial was that "[t]he buildings are over 4,000 square feet in floor area." Id. (emphasis added). We understand that this reference to "buildings" is to both the proposed building and the building that already existed on the Bus Lot.

   At some later point, Mr. Mathieu and the ZA discussed revisions to the 2007 application. Revisions were thereafter made to this application, including a reference that the proposed shed/barn would now be located on Richard's Lot. This was perhaps when the phrase "Hay + Haying Equipment" was added to the block on the application form labeled "Proposed Use." The ZA approved this revised permit application on November 8, 2008.

[5]  At trial, Richard Mathieu maintained that it was the ZA, not him, who inserted the phrase "Hay + Haying Equipment" in the description for the proposed use of the "shed." The ZA and the Town did not refute his testimony. Nonetheless, Mr. Mathieu did not dispute that his application, as approved by the ZA, contained this description and that he did not raise any objection to it. We therefore conclude that the approved and unappealed purpose for the proposed shed/barn is to store hay and haying equipment.

76. Once construction was complete, Mr. Mathieu began use of the barn without first applying for or securing a Certificate of Occupancy ("CO").

77. The ZA first advised Mr. Mathieu of his concerns that he had not applied for or secured a CO in a letter dated December 17, 2009. See Exhibit 27.

78. Mr. Mathieu continued to use the barn without a CO, but also submitted an application for a CO. On January 4, 2010, the ZA denied Mr. Mathieu's CO application, stating that DRB "approval [of access way over Linda's Lot was first] required . . . prior to issuing Certificate of Occupancy." Exhibit 31.

79. Mr. Mathieu continued to use the access way over Linda's Lot as a driveway for his barn without first receiving the necessary zoning permits, and continued to use the barn to store items of personal property without first securing a CO.

80. On January 25, 2010, the ZA forwarded the First NOV issued to Richard concerning the illegal use of his barn. The ZA advised in this NOV that Mr. Mathieu should cease use of the barn until after he secured a CO.

81. The ZA also stated in this NOV that if Mr. Mathieu cured this zoning violation within seven days, the Town would not prosecute this NOV.

82. Mr. Mathieu continued to use the barn for storage even after the cure period expired. He chose to continue to use the barn without first receiving a CO.

83. Beginning in July of 2009, the Mathieus, with the assistance of their engineer, began various efforts to secure the revised site plan approvals and permits that they needed to lawfully use the access over Linda's Lot as a driveway for the barn on Richard's Lot. The Mathieus did not secure the necessary access way permits until August 31, 2011. See ¶¶ 37–57, above. During this period of time, they continued to use the access way over Linda's Lot and the barn on Richard's Lot.

84. Sometime in 2010, Mr. Mathieu or his brother, Lionel, removed the mobile home on Richard's Lot that Lionel once occupied as his home. From that point forward, the barn became the only structure on that lot, which appeared to contradict the representation that the barn was to be an accessory structure on that lot.

85. Mr. Mathieu never occupied the modular home on his Lot as his residence.

86. In a letter to the Mathieus dated August 2, 2010, the Planning Commission clarified why Town officials were so concerned about Mr. Mathieu's use of the barn and the size of the structure. See Exhibit 48. Mr. Mathieu had previously advised that he wished to use the 9,600 square foot barn for a "small scale industry purpose." Id.

87. The Planning Commission noted that the applicable Regulations currently restricted buildings used for small scale industry in the AFR2 District to no more than 4,000 square feet in size and that his 9,600 square-foot building could therefore not be permitted for that purpose. Id. The Planning Commission advised, however, that if Mr. Mathieu restricted the use of his barn to agricultural purposes, that a permit could issue, even though his barn was more than 4,000 square feet, and that the Planning Commission would consider the storage of hay and haying equipment an agricultural use. Id.

88. On September 8, 2010, Town officials entered onto Richard's Lot (with his consent) and observed many items being stored in the barn that were neither hay nor haying equipment.

89. On September 24, 2010, other Town officials returned to inspect the barn on Richard's Lot. On this occasion, most (but not all) of the items in the barn were haying equipment. The Town officials prepared a list of the items they observed; a copy of that list was admitted at trial as Exhibit 51.

90. While Mr. Mathieu was with the Town officials during the September 24 site inspection and gave his consent, he attempted to prohibit their inspection of the outside areas surrounding the barn. The Town officials observed several large dump trucks, none of which appeared to be haying equipment, stored along an outside wall of the barn.

91. Mr. Mathieu's use of the barn without a CO continued until December 30, 2011. On that day, the ZA issued a temporary CO that authorized the use of the barn on Richard's Lot, solely for the purpose of storing hay and haying equipment.

92. The reason that the ZA provided for only issuing a temporary CO was that the winter weather conditions did not allow for his full inspection of the barn and the area surrounding it. The ZA directed in the temporary CO that Mr. Mathieu "must apply for a [permanent CO] in Spring 2012, when weather permits the [ZA] to make the final inspection required and confirm

-15-

that the driveway/access roads comply with the Subdivision Regulations and the approved plans." Exhibit 62.

93.   At Mr. Mathieu's request, the ZA visited Richard's Lot to complete his inspection and to deliver an application for a permanent CO. Mr. Mathieu refused to allow the ZA to inspect the barn; the ZA therefore left Richard's Lot without completing his inspection.

94.   On May 7, 2012, Mr. Mathieu permitted the ZA to return to Richard's Lot to complete his inspection. Once the ZA was able to confirm by his inspection that the access way and the barn were constructed and being used in conformance with the approved plans and permits, the ZA issued a permanent CO for the barn that same day. See Exhibit 63.

95.   The ZA noted on the permanent CO that it "permits the use of the barn structure only for storage of hay and hay equipment. The shared driveway that leads to the barn [from Linda's Lot] was inspected and complies with the subdivision regulations and the approved plans." Id.

96.   The period of time during which the zoning violations existed on Richard's Lot concerning the continued use of his barn without the necessary CO, after the seven day cure period expired, totaled 696 days (i.e.: February 2, 2010 to December 30, 2011).

### ii.   Use of Access Way over Linda's Lot (Second NOV Issued to Richard)

97.   The site plan prepared at Mr. Mathieu's direction and relied upon by the Planning Commission in rendering its 2001 subdivision and 2008 amendment approvals shows a driveway for the barn on Richard's Lot as solely travelling from Mathieu Road. This site plan is attached to the Planning Commission 2008 decision. See Exhibit 11 at 4. The site plan does not show any access to Richard's Lot from Linda's Lot. Id.

98.   None of the prior plans that the Mathieus submitted to the ZA, Planning Commission, or DRB showed an access way for Richard's barn travelling across Linda's Lot, prior to the Mathieus' actual construction and use of that access way.

99.   Despite the Planning Commission direction in 2001 and 2008, Richard Mathieu caused an alternate access way for his barn to be constructed over Linda's Lot. Mr. Mathieu had no permit or other authority to construct or use this alternate access way when he first developed it in 2009.

100. The ZA first advised Mr. Mathieu of his concerns about the unpermitted access way over Linda's Lot by way of his letter dated June 17, 2009, a copy of which was admitted at trial as Exhibit 13.

101. Mr. Mathieu continued to construct and use the access way over Linda's Lot, even after the ZA expressed his concerns and requested that he cease doing so until he obtained the necessary zoning permits.

102. When Mr. Mathieu refused, over the course of the following year, to apply for or obtain a permit for the access way, the ZA on July 10, 2010 issued the Second NOV to Richard. That NOV included notice of three zoning violations based upon Richard Mathieu's (a) construction and use of the access way over Linda's Lot; (b) use of that alternate, unpermitted access way, rather than using Mathieu Road, as directed by the Planning Commission; and (c) construction and use of the access over the Bus Lot to the modular home on Richard's Lot, as more fully described in ¶¶ 109–117, below.

103. As noted above in ¶¶ 59–63, above, the Mathieus did not cure the zoning violations regarding the unpermitted assess way over Linda's Lot until August 31, 2011, when the DRB authorized the issuance of the necessary zoning permits for the construction and use of that access way. See Exhibit 54.

104. During the intervening period, after the Second NOV issued to Richard was delivered, Richard Mathieu continued to develop and use the access way over Linda's Lot for access to Richard's Lot. While the Mathieus pursued several efforts to cure their zoning violations during the intervening period, they at no time ceased the use and benefits of this unpermitted access way.

105. Mr. Mathieu failed to remedy these zoning violations within the NOV cure period (i.e.: by July 8, 2010), and the violations continued until August 31, 2011. Mr. Mathieu was therefore in violation of this portion of the Second NOV issued to him for a period of 419 days.

### iii. Use of Access Way over Bus Lot (Second NOV Issued to Richard)

106. Sometime after the 2001 subdivision approval, the Mathieus applied for and received a permit to install a modular home on Richard's Lot.

107. The Mathieus then applied for and received approval to amend their 2001 subdivision site plan by expanding the building envelope on Richard's Lot. The Planning Commission approved the Mathieus' request on September 25, 2008. See Exhibit 11. By that approval, the Commission directed that "[a]ll structures on the subject parcel shall solely be accessed by Mathieu Road." Id. at 2, ¶ 3.

108. A portion of Mathieu Road, a private roadway, is on Richard's Lot.

109. In the 2008 application for an amendment to the prior site plan, Richard Mathieu identified a driveway spur off of Mathieu Road to serve the modular home on his Lot that his brother, Lionel, later occupied as his residence.

110. However, Mr. Mathieu later constructed or allowed others to construct an alternate gravel driveway leading from the rear (i.e.: northerly) edge of the bus parking area on the Bus Lot, on to Richard's Lot, and to the modular home. No one sought or obtained a permit or other authority for this alternate driveway to Lionel's home before it was built and used.

111. The ZA became concerned that the Mathieus had constructed, used, and allowed others to use this alternate driveway without first applying for and receiving a permit or other authority to do so. The ZA therefore wrote to Mr. Mathieu, as the managing member of Mathieu Properties, to express his concerns about the unpermitted access to Lionel's home that had been constructed over the Bus Lot. See Exhibit 15.

112. The ZA suggested ways that this zoning violation could be cured, including removing the unpermitted driveway or seeking amendments to the prior subdivision and site plan approvals that directed that all structures on Richard's Lot be accessed via Mathieu Road. See Exhibits 11 and 15.

113. Mr. Mathieu chose to abandon the unpermitted driveway over the Bus Lot and applied for the necessary amendments to his prior site plan and subdivision approvals for the Bus Lot.

114. By decision issued on April 26, 2010, the DRB (which had replaced the Planning Commission as the municipal panel hearing such applications) approved the site plan amendment application, with several conditions. See Exhibit 37 at 2–3, ¶¶ 1–14.

115. Condition 8 of the DRB approval specifically directed that the area on the Bus Lot over which Mr. Mathieu and others had constructed the unpermitted driveway "shall be raked,

tilled, mulched and seeded so the defined parking area on the ground conforms to the last revised site plan . . . submitted to the Town of Westford." Id.

116. On July 1, 2010, the ZA mailed to Mr. Mathieu the NOV issued to Richard; that NOV listed several violations, including "[c]onstruction and use of an access to and across parcel #01TW012 [i.e.: the Bus Lot and to the modular home on Richard's Lot] without required approvals and a zoning permit." Exhibit 4. The ZA's principal motivation for referencing this violation in the July 1 NOV was that the Mathieus had failed to complete the remedial measures to the Bus Lot directed by the DRB in its April 26 decision.

117. The Mathieus eventually completed the site remediation work in accordance with the April 26, 2010 DRB decision (Exhibit 37) by October 20, 2010. See Exhibit 55.

118. The Mathieus asserted at trial, through the testimony of several witnesses, that they completed the required remediation work on the Bus Lot prior to July 13, 2010. We find more credible, however, the testimony and photographic evidence submitted by the Town that the Mathieus did not complete the required remediation work until October 20, 2010. See photos admitted at trial as Exhibit 56.

119. We detail the period of time that Richard Mathieu allowed this violation to continue in ¶¶ 132–133, below, since he and Mathieu Properties were cited by separate NOVs, each dated and mailed on July 1, 2010, that referenced the same period of time (98 days) that the zoning violation continued. See Exhibits 4 and 5.

### iv. Use of Unpermitted Access Way Instead of Mathieu Road (Second NOV Issued to Richard)

120. The Second NOV issued to Richard also gave notice that the ZA considered it a separate zoning violation for Richard Mathieu to "use any access other than Mathieu Road to access [Richard's Lot]" since the Planning Commission directed him to do so as a condition of its 2008 site plan amendment approval.

121. As detailed above, Mr. Mathieu chose not to use Mathieu Road as the access for his Lot. Rather, he constructed and used two alternate access roads: one over Linda's Lot to access his barn and a second over the Bus Lot to access the modular home occupied by his brother, Lionel. At no time prior to constructing and using these unpermitted access ways did Mr. Mathieu

apply for approval of these two alternate accesses or for revision to the Planning Commission directive that only Mathieu Road was to be used as access for Richard's Lot.

### d. Enforcement Action Concerning First and Second NOVs Issued to Richard

122. By January 21, 2011, the Town confirmed that Mr. Mathieu continued to use the barn on his Lot without first receiving a CO and therefore filed its zoning enforcement complaint with this Court in Docket No. 9-1-11 Vtec.

123. When the Town filed its complaint against Mr. Mathieu, it cited the zoning violations listed in the First NOV issued to Richard: occupancy of his barn without first securing a CO that authorized him to do so.

124. On February 7, 2011, Mr. Mathieu authorized an answer and affirmative defenses to be filed on his behalf in response to the Town's complaint. Due to the nature and extensiveness of his answer, the Town was required to complete extensive discovery and trial preparations, thereby committing extra time and resources to the prosecution of the various zoning violations with which Mr. Mathieu was charged.

125. The Town subsequently moved to amend its complaint to incorporate the three additional zoning violations cited in the Second NOV issued to Richard. On October 9, 2012, this Court granted the Town's motion to amend its Complaint. Mr. Mathieu continued to vigorously defend against all of the Town's zoning violation allegations.

### e. Zoning Violations by Mathieu Properties

126. The ZA also mailed a NOV to Mathieu Properties on July 1, 2010. As noted above at ¶ 34, a copy of this NOV was admitted at trial as Exhibit 5 and is referred to here as the NOV issued to Mathieu Properties.

127. The NOV issued to Mathieu Properties identified several alleged zoning violations, all of which related to the construction and use of an unpermitted access way over the Bus Lot and to the modular home on Richard's Lot; the facts concerning that zoning violation are detailed in ¶¶ 110–118, above. The NOV details that this unpermitted access way was developed in an area on the Bus Lot that was supposed to be (and once was) a grassed area, and that development of the unpermitted access way occurred without first securing amendments to the Bus Lot site plan and final plat.

-20-

128. The NOV issued to Mathieu Properties provided that, if the specified zoning violations were cured within seven days of receipt, the Town would not take legal action against Mathieu Properties to recover fines or other relief as a consequence of the zoning violations that occurred on the Bus Lot. Due to a delay in Mathieu Properties receiving the July 1 NOV, the parties stipulated that the cure period for the NOV issued to Mathieu Properties was extended to July 13, 2010.

### f. Enforcement Action Concerning NOV Iissued to Mathieu Properties

129. The Town filed its zoning enforcement complaint against Mathieu Properties on February 28, 2012. While the Town essentially admitted at trial that the Mathieus had completed all remedial measures on the Bus Lot for the zoning violations that were detailed in the NOV issued to Mathieu Properties, the Town asserted that it filed this enforcement action because Mathieu Properties was responsible, as the property owner, for the failure to complete the remediation work before the cure period expired on July 13, 2010.

130. Mathieu Properties first filed a motion to dismiss in response to the Town's enforcement complaint against Mathieu Properties. The Court denied that motion by entry order issued on October 10, 2012. Town of Westford v. Mathieu Props., LLC, No. 28-2-12 Vtec, slip op. at 1 (Vt. Super. Ct. Envtl. Div. Oct. 10, 2012) (Durkin, J.). Mathieu Properties thereafter filed its answer and affirmative defenses, including claims that it had timely appealed the NOV issued to Mathieu Properties. No facts presented at trial provided sufficient support for Mathieu Properties' affirmative defense claims.

131. As a consequence of the denials and affirmative defenses asserted on behalf of Mathieu Properties, the Town was compelled to conduct extensive pre-trial discovery and motion practice, thereby adding to the Town's expenses in this litigation.

132. As noted above, the Mathieus asserted vigorously at trial that they completed all remediation work on the Bus Lot by July 13, 2010 and that Mathieu Properties should therefore not be fined. The more credible evidence caused us to conclude, however, that the remediation on the Bus Lot was not completed until October 20, 2010.

133. The period of time during which the zoning violations existed on the Bus Lot, after the cure period expired, totaled 98 days (i.e.: July 13, 2010 to October 20, 2010).

**IV.   Legal Fees Incurred by the Town**

134.   The Town incurred significant legal fees that directly resulted from the zoning violations committed by the Mathieus by either their separate or joint actions.

135.   There were serious disputes at trial about the Town's assertion that fines should be assessed against the Mathieus, particularly at a rate that would fully reimburse the Town for the attorneys' fees and other costs of noticing and then prosecuting the Mathieus for their zoning violations.  We address that legal argument in the Conclusions section, below.  However, we note that there was no credible challenge presented at trial as to the reasonableness of the attorneys' fees and expenses incurred by the Town in response to the Mathieus' zoning violations.  We therefore conclude that the fees claimed, which are summarized below, are reasonable in light of the efforts expended by the Town's employees and attorneys.

136.   The Town incurred legal fees and expenses totaling over $80,032.00.  This figure does not include the legal fees incurred during the last day of trial or to complete the Town's post trial filings.

137.   This summary of the Town's legal expenses also does not include the cost of the Town employees' time in responding to the various Mathieu zoning violations.  The Town employees that testified at trial did not keep complete records of the time that they devoted to investigating the Mathieu zoning violations and the subsequent prosecution of those violations.  Of the records that they did keep, two Town employees provided convincing and uncontested testimony that they devoted time to responding to the Mathieu zoning violations in the following total amounts: Maurice Rathbun, former Town of Westford Zoning Administrator: $454.25; and Melissa Manka, Town of Westford Planning Coordinator: $409.99, thereby totaling $864.24.  Their testimony also convinced the Court that they devoted considerably more time to responding to the Mathieus' zoning violations than their records reflected.

138.   We found it difficult to reconcile the allocation provided by the Town of its attorneys' fees and expenses as between the three Defendants.  However, for reasons more fully explained in our Conclusions section, below, we conclude that it is not necessary for this Court to allocate these fees to separate Defendants in our computation of the proper fine assessment, since the fees were incurred in a joint effort to prosecute the Mathieu zoning

violations and since the violations were a coordinated effort by the Mathieus and their company. Further, while the Town chose (as it was entitled) to assert zoning violation claims against each individual property owner, the multiple claims against multiple parties are summarized into the following three concerted zoning violations:

a. Construction and use of the unpermitted access way over Linda's Lot and to Richard's Lot for access to Richard's barn;

b. Violations committed solely by Richard Mathieu, including (i) occupancy and use of Richard's barn without first securing a CO; and (ii) failure to use the access way for the modular home that was designated in the Planning Commission approval (i.e.: Mathieu Road); and

c. Construction and use of a driveway over the Bus Lot to Lionel's modular home.

139. We further note that the First and Second NOVs issued to Richard together gave notice of four separate zoning violations: (1) use of the barn on Richard's Lot without first securing a CO; (2) construction and use of an unpermitted access way for that barn over Linda's Lot; (3) construction and use of a driveway over the Bus Lot to the modular home on Richard's Lot; and (4) use of the unpermitted access way over Linda's Lot, instead of the access way over Mathieu Road that was directed in the site plan approval by the Planning Commission on September 25, 2008. See ¶¶ 23 and 26, above.

140. The Town's evidence of fees and expenses does not delineate between the four zoning violations with which Mr. Mathieu was charged, since the Town's efforts to compel Mr. Mathieu to cure these zoning violations was a unified effort. We address allocation of the proper fines to be assessed for each of Mr. Mathieu's zoning violations in the Conclusions of Law section, below.

141. The total attorneys' fees and expenses incurred by the Town as a consequence of the Mathieus' collective zoning violations are accurately summarized in Exhibits 73 and 73(A)–73(F). We conclude that those fees and expenses were reasonable, in light of the tasks assigned to the Town's attorneys and the complexity of the responses needed for Mathieu zoning violations, as well as the various applications that the Mathieus presented, withdrew, revised, and modified.

142. The Mathieus also incurred considerable attorneys' and engineer's fees and expenses regarding the three Lots that are the subject of these enforcement actions. Mr. Mathieu

credibly testified that he incurred professional fees since first receiving the ZA's warnings of the alleged zoning violations that totaled in excess of $140,000.00. The Town did not challenge Mr. Mathieu's fees estimates, although Mr. Mathieu did admit that a sizeable portion of the professional fees he and his fellow Defendants incurred were for services that he would have incurred in the ordinary course of seeking the needed permits and approvals before he commenced the unpermitted land development. We therefore conclude that some, but not all, of the fees that the Mathieus incurred should be considered as a mitigating factor in our assessment of the proper amount of fines to asses because of their respective zoning violations.

## Conclusions of Law

### I. Overview

Municipal enforcement actions initially present two main challenges for this Court. First, we must determine whether the complained-of zoning violations occurred. If our response to this first question is that no violation occurred, then our analysis is complete and the matter must be dismissed. If, however, we conclude that the complained-of violations did occur, we must then determine what fines, if any, are appropriate to assess against the violating defendant and in favor of the aggrieved town. Our analysis is principally governed by the applicable regulations that a municipality asserts have been violated, however, state law sets the parameters for what constitutes a zoning violation (see 24 V.S.A. § 4449(a)(1)–(a)(2)) and the maximum level of fines that may be imposed for a zoning violation (see 24 V.S.A. § 4451(a)).[6]

Here, the Town has enacted zoning regulations that direct when a zoning enforcement action must be initiated, who must initiate it, and the maximum amount of fines that may be imposed for a zoning violation that has been admitted, conceded, or determined by this Court. See Regulations § 7.5.

### II. Finality of NOVs Issued to Each Defendant

We have previously addressed the legal issue of the finality of the alleged zoning violations asserted against Linda Mathieu and Mathieu Properties. As to the claims against

---

[6] A municipality may also seek injunctive relief against a zoning violator, per 24 V.S.A. § 4452. Since no injunctive relief was sought at trial in any of the pending enforcement actions, we do not discuss it here.

Mrs. Mathieu, we granted the Town summary judgment on the legal question of whether Mrs. Mathieu had committed the zoning violations specified in the 2009 NOV issued to her. See Town of Westford v. L. Mathieu, No. 153-10-09 Vtec, slip. op. at 3–4 (Vt. Super. Ct. Envtl. Div. Oct. 10, 2012) (Durkin, J.) (concluding that since Mrs. Mathieu had not disputed the Town's representations that she and her husband constructed the unpermitted access way over Linda's Lot and to Richard's barn without first securing a permit, the Town was entitled to summary judgment).[7]

Regarding the zoning violations specified in the NOV issued to Mathieu Properties, we were asked to address a similar legal challenge, in that Mathieu Properties eventually (although not initially) conceded that it had not filed a timely appeal of the NOV issued to the company. However, the company challenged the Town's assertion that the NOV cure period expired on July 8, 2010 (it claimed the cure period extended to July 13, 2010). Mathieu Properties also asserted that, in any event, it had completed the necessary remedial measures before the cure period expired and therefore the Court should dismiss the Town's enforcement action. See Town of Westford v. Mathieu Props., LLC, No. 28-2-12 Vtec, slip op. at 2–3 (Vt. Super. Ct. Envtl. Div. May 8, 2013). We concluded that the cure period extended to July 13, 2010, but noted that the facts surrounding when the company had completed its remedial measures were disputed and that those factual and legal issues had to be addressed at trial. Id.

We did enter summary judgment on the Town's cross motion, concluding that Mathieu Properties had waived its right to challenge the validity of the NOV issued to Mathieu Properties, since it had failed to appeal that NOV and therefore, pursuant to 24 V.S.A. § 4472(b), "it waived its right to challenge that NOV determination 'directly or indirectly.'" Id. at 3 (quoting 24 V.S.A. § 4472(b)). We rejected Mathieu Properties' assertion that when a zoning violation is remediated within the cure period, the violation is expunged. Rather, we explained that if the trial evidence convinced the Court that Mathieu Properties had fully

---

[7] The Court's October 10, 2010 entry order also addressed Mrs. Mathieu's competing motion that she was entitled to summary judgment, based upon the legal doctrine of equitable estoppel. We concluded that the Town had presented sufficient factual representations in an affidavit from the current zoning administrator that caused us to conclude that the facts material to Mrs. Mathieu's equitable estoppel claim were disputed and that she was therefore not entitled to summary judgment at that time. Id. at 3. We address the Mathieus' renewal of equitable estoppel claims in the next section of our Conclusions of Law.

remediated the violations by July 13, 2010, the company would not face a claim for fines, however, the notice of violation would remain of record. Id. (citing 24 V.S.A. § 4451(a)).

Thus, these pre-trial rulings left two factual issues to be determined after trial: first, whether convincing facts existed to support Mrs. Mathieu's equitable estoppel claims and second, whether Mathieu Properties completed its remedial measures before the cure period expired and, if not, when Mathieu Properties completed such remediation. We explain our determination on these disputed facts below.

We must next address the legal sufficiency of the NOV issued to Richard. Mr. Mathieu contested the allegations against him in the Town's complaint with equal vigor as Mrs. Mathieu and Mathieu Properties. In fact, it became readily apparent from the trial testimony that Richard Mathieu, together with the professionals assisting him, was the principal director for all of the Defendants' defenses. Mr. Mathieu was the only principal witness to testify at trial and the other witnesses (expert or otherwise) called to testify in support of all three Defendants spoke of receiving direction from Richard Mathieu, not Mrs. Mathieu or any other individual with authority from the limited liability company.

As to the Town's claims against Richard Mathieu, specified in the First and Second NOVs issued to Richard, we are presented with similar facts that ultimately lead to a legal conclusion that, by virtue of his failure to timely appeal those two NOVs, Mr. Mathieu foreclosed his right to challenge the specified zoning violations, "directly or indirectly" in this or any other proceeding. See 24 V.S.A. § 4472(b). While Mr. Mathieu asserted that he had appealed the NOVs issued to him, no credible trial evidence supported this claim. We therefore conclude that the two NOVs issued to Richard have also become final.

### III.     Applicability of the Equitable Estoppel Doctrine.

During trial and in their post-trial filings, Defendants asserted that the doctrine of equitable estoppel should bar the Town's NOV claims against each of them. Specifically, Mr. and Mrs. Mathieu claim that the Town represented at an early stage that if they simply submitted a permit application for the "as-built" access way over Linda's Lot, the Town would not pursue enforcement of the respective NOVs or its claims for fines against any of them. We addressed the equitable estoppel doctrine in a pretrial entry order and concluded that a

dispute as to the material facts prohibited us from granting Mrs. Mathieu's summary judgment request. Town of Westford v. L. Mathieu, No. 153-9-10 Vtec, slip op. at 3–4 (Vt. Super. Ct. Envtl. Div. Oct. 10, 2012) (Durkin, J.). That pretrial order reviewed the elements that must be proved to support an equitable estoppel claim. Id. at 3. We need not review those elements again here because we conclude that Mr. and Mrs. Mathieu's claims that the Town assured them that it would not pursue the zoning violations are not credible.

We find their claims not credible for several reasons. First, we find more credible the testimony offered by the Town from the ZA and Planning Coordinator. The testimony offered by Town witnesses is reinforced by the written warnings in the NOVs, which each provided that if the Defendants' remedial actions were not accomplished within the cure period, "the Town of Westford may pursue this matter in Environmental Court, where the Town of Westford may seek appropriate injunctive relief and fines of up to $100.00 for each day [that] each violation continues . . . ." Exhibit 3 at ¶ 3.

Second, we find it incredible that a Town official would make the assurances that Defendants represent, particularly since at the time of the alleged representations, the Mathieus had not yet even produced or presented an as-built permit application or site plan. How and why would a town official tasked with enforcing the zoning regulations make such an assurance when they had not yet received an application or determined its completeness? We conclude that no such assurance was made to the Mathieus by a Town official.

Third, the Mathieus took years to present sufficient applications that allowed the DRB to ultimately grant their requests. For all these reasons, we conclude that the Mathieus are not entitled to a bar against the Town's claims based upon the doctrine of equitable estoppel.

Richard Mathieu and Mathieu Properties also assert that the equitable estoppel doctrine bars the Town's claims against them, since the Town represented that no claims would be made against them if their remedial measures were completed before the cure period expired. Mr. Mathieu, both on his own behalf and that of his company, assert that since they did complete the remedial measures before the cure period expired, the Town should be equitably estopped from making zoning violation claims against either entity. We have concluded that the Mathieus did not complete the remedial measures on the Bus Lot until

October 20, 2010, some 98 days after the cure period expired. We therefore conclude that the Town's claims may continue and **DENY** Mr. Mathieu's and Mathieu Properties' assertion that the equitable estoppel doctrine applies.

IV.     **Defendants' Assertion that Town Waived its Claims.**

Defendants also collectively assert that the Town waived its right to collect fines and recover its costs from each of the Defendants. These claims overlap with Defendants' equitable estoppel claims, are based upon the same factual assertions, and must be rejected for the same reasons. First, Defendants claim that the Court should conclude that the Town waived its right to receive awards of fines and recovery of its costs from Mr. and Mrs. Mathieu for the zoning violation claims because the Town represented that it would not pursue the enforcement actions if the Mathieus simply applied for an as-built permit. As noted above, Defendants' assertions are not supported by the credible facts.

With the significant passage of time between the NOVs being issued (2009 and 2010) and the Mathieus' filing a sufficient set of applications, such that the DRB could issue the as-built permits, it appears that the Mathieus believed that the Town delivered an open ended waiver of its claims. No facts presented at trial support the Mathieus' assertions. The Mathieus' assertions ignore the undisputed fact that they developed their properties in a wide variety of ways without the necessary permits, long before the Town began its efforts to negotiate a resolution of their zoning violations. Building and using first, before applying for and receiving a zoning permit, is not the course of land development directed by the Regulations. The Town reasonably represented that if the Mathieus cured their zoning violations within the cure periods stated in each NOV, the Town would not (and could not) legally prosecute them. As detailed above, the Mathieus chose not to, and were not able (for a variety of reasons) to cure their zoning violations for months and even years. The credible facts presented at trial do not support the Mathieus' assertions as to waiver. We therefore **DENY** their waiver claims.

The Mathieus also claim that the Town waived its right to recover from both Mr. Mathieu and Mathieu Properties for the construction and use of the unpermitted driveway over the Bus Lot and to Lionel's modular home on Richard's Lot because at one point in 2001

the ZA (Mr. Rathbun) came to deliver a certificate of occupancy application for the modular home on Richard's Lot and when he did, he drove to the home by using the unpermitted drive over the Bus Lot.

The Mathieus have not provided citation to the legal authority for this claim and we have found none from our own independent research. Presumably, their claim is premised upon a general theory that if a zoning administrator uses an unpermitted driveway (or for that matter, visits an unpermitted home or factory), then the municipality waives any subsequent claim that a permit was required. We decline to create such a legal doctrine where there is no precedent for it.

Secondly, the Mathieus claim that they completed the remedial measures on the Bus Lot, on behalf of Mathieu Properties, before the cure period expired and that the Town is therefore barred from pursuing fines or costs of reimbursements. Such would be the case, pursuant to 24 V.S.A. § 4451(a), if those facts were proved at trial. However, the credible facts revealed that the driveway remediation work was not completed by July 13, 2010, but rather took until October 20, 2010, some 98 days after the cure period expired. Our factual finding here is reinforced by the photographs that are included in Exhibit 56; these photographs show the recently re-seeded, tilled, and mulched area on the Bus Lot. Town officials testified that these photographs were taken during their visit to the Bus Lot on October 20, 2010, and no evidence was presented to contradict that. We therefore conclude that the Mathieus' remedial work on the Bus Lot was not completed before October 20, 2010 and assess fines for those 98 days of noncompliance, as detailed below. Defendants' waiver claims as to the unpermitted access drive on the Bus Lot are not supported by the credible facts; thus, their waiver claims must also be **DENIED**.

## V.  Fines to be Imposed against Each Defendant.

Having determined that each of the zoning violations asserted against each Defendant are final and enforceable, we turn to our determination of what fines, if any, should be imposed against each Defendant. We first must address three procedural matters.

First, we note that the Westford Regulations provide a reviewing court with the discretion to impose fines of "not more than $100 per lot or parcel for each offense, unless a

higher fine is permitted under amendments to §4451 of Title 24 . . . ." Regulations § 7.5. After the adoption of the Westford Regulations, the Legislature amended § 4451(a) to provide for "[fines of] not more than $200.00 for each offense." 24 V.S.A. § 4451(a). Both the Regulations and the statute direct that "[e]ach day that a violation is continued shall constitute a separate offense." Id.

We have interpreted this statute, its predecessor, and similarly worded municipal zoning regulations to provide that a reviewing court has very broad discretion in assessing fines for a zoning violation: from no fines, to fines that accumulate at a rate of up to $200.00 per day, per violation. See Town of Colchester v. Andres, No. 30-3-11 Vtec, slip op. at 3 (Vt. Super. Ct. Envtl. Div. Jan. 31, 2013) (Durkin, J.) aff'd (with remand to recalculate number of days violation occurred), No. 2013-081 (Vt. Nov. 20, 2013) (unpub. mem.), available at: https://www.vermontjudiciary.org/UPEO2011Present/eo13-081.pdf.

In this instance, the Westford Regulations provide the added multiplier of "per lot." Regulations § 7.5. We note, however, that the NOVs served on each Defendant only gave notice that fines could be asserted by the Town "of up to $100.00 per day for each day [that] each violation continues." Exhibits 2–5. We will therefore not impose fines above this daily limit.

Second, there is little guidance in either the Regulations or the applicable statutes to assist in determining what level of fines should be assessed within the broad discretion stated above. Absent specific standards in the Regulations, we will follow our past practice of relying upon the Uniform Environmental Law Enforcement Act (10 V.S.A. §§ 8001 through 8021); this practice has been approved by our Supreme Court, which has stated that this Court has "the discretion to determine the amount of [the] fine, and, in doing so, to balance any continuing violation against the cost of compliance and to consider other relevant factors, including those specified in the Uniform Environmental Enforcement Act." City of St. Albans v. Hayford, 2008 VT 36, ¶17, 183 Vt. 596 (quoting In re Jewell, 169 Vt. 604, 606–07 (1999) (mem.)). While this Uniform Act specifically provides for the enforcement of environmental laws by state agencies, the seven standards provided in 10 V.S.A. § 8010(b) are helpful in determining the proper level

of fines to be imposed against one who violates municipal zoning regulations. Id. We therefore review the Mathieus' respective actions within the standards identified in 10 V.S.A. § 8010(b).

Third, while we understand the necessity of serving separate NOVs against each of the Defendants, we note that there is an overlap in both the violations identified in each NOV and in the Defendants who contributed to each zoning violation. Given the fact that Mr. Mathieu contributed to all of the violations established by the Town and that it would be inefficient, perhaps unjust, to impose independent fines against multiple parties for what is essentially the same zoning violation, we have created a somewhat unique classification of the proved zoning violations, for the purpose of determining the proper level of fines. Our classifications are as follows:

a. **As to Mr. and Mrs. Mathieu:**

   i. Construction and continued use of an access way over Linda's Lot and Richard's Lot to the barn on Richard's Lot.

   ii. Mrs. Mathieu was served on September 21, 2009 with the NOV identifying this violation, and Mr. Mathieu was served on July 1, 2010 with the NOV addressed to him which included this same violation, among others. The Mathieus, working together, finally secured all necessary "as-built" permits on August 31, 2011. We therefore have concluded that Mr. and Mrs. Mathieu, while working together, were in violation of the NOVs issued against them for continuous periods of 702 and 419 days, respectively.

b. **As to Mr. Mathieu alone:**

   i. Occupancy and use (including storage of items other than hay and haying equipment) of the 9,600 sq. ft. barn on Richard's Lot without first securing a CO.

   ii. Mr. Mathieu's occupancy and use of this barn continued after the NOV cure period expired on February 2, 2010 and until he secured a temporary CO on December 30, 2011; that period of violation totaled 696 days.

   iii. Construction and use of an access way for the modular home on Richard's Lot other than the drive off of Mathieu Road that was a condition of the 2008 Planning Commission approval.

   iv. Mr. Mathieu (himself or others he allowed) continued to use this alternate, unpermitted access way after the cure period expired on July 8, 2010 and until he and others completed the raking, tilling, seeding, and mulching of the lawn area on October 20, 2010; that violation period lasted 98 days.

c.  **As to Mr. Mathieu and Mathieu Properties:**

    i.  Construction and use of an unpermitted access way over the Bus Lot for the modular home on Richard's Lot.

    ii.  Their use of this unpermitted access way continued after the cure period expired on July 13, 2010 and continued until the violation was remedied when all remediation measures were completed on October 20, 2010.  We therefore conclude that Mr. Mathieu and Mathieu Properties allowed and caused this violation to continue for a total of 98 days.

We use this aggregation of the zoning violations and the responsible parties as we render our determinations below of the appropriate level of fines for each day that each zoning violation occurred.

## VI.  Aggravating and Mitigating Factors; Final Determinations

Section 8010(b) provides seven factors[8] for use in determining the appropriate amount of a penalty to be imposed as a consequence of violating a state environmental law.  We have found these seven factors helpful as this Court tries to determine the appropriate level of fines to impose as a consequence of violating municipal zoning regulations.  E.g., Town of Fairfax v. Beliveau, No. 274-11-08 Vtec, slip op. at 7 (Vt. Super. Ct. Envtl. Div. Mar. 30, 2012) (Wright, J.) aff'd, In re Beliveau NOV, 2013 VT 41.  In determining the appropriate level of fines to be imposed upon each of the Defendants here, we have considered the following facts revealed at trial:

### a.  As to Mr. and Mrs. Mathieu:

When Mr. and Mrs. Mathieu constructed and used the alternate, unpermitted access way over Linda's Lot to the barn on Richard's Lot, they did not cause a direct actual or potential impact on public health, safety, welfare, or upon the surrounding environment, other than the resulting impact upon the septic system serving the residence on Linda's Lot.  We consider this factor under 10 V.S.A. § 8010(b)(1).  Their actions did, however, result in an impact upon the public that we deem serious: a wanton disregard for the duly enacted municipal land use regulations.  The Westford Regulations were adopted after public hearing and evidence the

---

[8]  Section 8010(b) of Title 10 actually has eight subsections.  However, since subsection (b)(5) has been repealed, the statute now only provides seven factors for consideration.

community's determination of how it wishes to see development occur. The Mathieus' actions evidence a determination that they should be allowed to develop their property any way they wish. Their disregard for the duly adopted Regulations is evidenced by their continued use of this access way after they were notified that such use was not permitted.

The Mathieus claimed that the Town caused several delays in the review of their various "as-built" permit applications and that the Town's delays caused an increase in the accumulated attorneys' fees and litigation expenses. Delays by the prosecuting entity are a factor to be considered. See 10 V.S.A. § 8010(b)(2). But we believe the more credible evidence showed that the Town only contributed to some of the delays that these parties endured. Much of the delay, certainly while this violation continued from September 21, 2009 (the date of the NOV issued to Linda), July 1, 2010 (the date of the Second NOV issued to Richard), and the final compliance date of August 31, 2011 (the date the DRB approved the Mathieus' various "as-built" applications) was caused by the ever-changing presentations by the Mathieus of what they intended to do with their property, all while they continued to construct and use the unpermitted access way. The Town Planning Coordinator credibly testified at trial that some of her most time-consuming efforts were expended prying explanations from the Mathieus of what they actually wanted or planned to do with their land.

We do not conclude that the Town is blameless for some of the delay or the resulting animosity between the Mathieus, Town officials, and their respective attorneys. These contributions to the delays by Town officials, while relatively minor, are one reason why we have determined not to award the Town a full recovery of its legal fees. There are two other reasons why we choose not to award a full recovery to the Town: (1) some of the time expended by Town officials and their attorneys were incurred while reviewing the Mathieus' zoning applications. While several of these applications were for "as-built" permits to cure zoning violations, we cannot include reimbursement of such fees and expenses in our fine award, since municipalities are obligated to review zoning applications, without reimbursement of the time expended in their review. Further, even where the legal fees and employee time expenses were incurred while responding to the Mathieus' actions, we cannot conclude that every expense a town incurs as a consequence of a zoning violation should be reimbursed in all

-33-

instances. Sometimes, a town must incur the expense of employees responding to allegations that someone has committed a zoning violation, and even seek the advice of legal counsel, knowing full well that that all of their expenses will not be recoverable. When a town demands full reimbursement of every legal fee and expense incurred, litigation can be unreasonably extended. Sometimes, a town must recognize that its expenses in responding to zoning inquiries, even violations, is a cost incurred as a consequence of maintaining its zoning regulations. This reality <u>does not</u> cause us to conclude that a town is never entitled to a full recovery of its legal fees. On the contrary, in the past we have awarded recoveries in excess of a town's legal fees. It is but one factor we must and do consider in each case.

We also consider as an aggravating factor that Mr. and Mrs. Mathieu "knew or had reason to know [that this] violation existed" from at least the moment that they were served with the respective NOVs mailed to each of them. We consider this aggravating factor in assessing the proper rate of daily fines, pursuant to 10 V.S.A. § 8010(b)(3). The Mathieus did not dispute receiving those NOVs and admit to continuing to use and allow others to use the unpermitted access way over Linda's Lot. The Mathieus offered testimony that VTrans officials believed that the access from the Westford-Milton Road was preferred over a multi-use curb cut on Vermont Route 128, via Mathieu Road, and that was the basis for the ultimate resolution of this zoning violation. But the Mathieus never offered an explanation for why they did not contest the Planning Commission directive that Mathieu Road be the sole access. They asserted at trial that this condition was added after the Commission recessed its hearing. Even if this were true (and the evidence at trial caused us to believe it not to be true), the Mathieus received the Commission decision, including the Mathieu Road condition, consciously chose not to question it, and then chose to disregard it and develop the unpermitted access way over Linda's Lot.

We did not receive evidence that the Mathieus committed other material zoning violations prior to the dates that the NOVs were mailed to each of them; had we received such evidence, we would take it in to consideration. See 10 V.S.A. § 8010(b)(4). We have taken into consideration the evidence, for the most part uncontested, that Mr. Mathieu committed multiple zoning violations during overlapping time periods, and continued those violations,

even after being notified of them. The evidence presented showed that he did not have a valid foundation for challenging these violations and ultimately remedied the violations by submitting an adequate series of "as-built" permit applications, albeit after his fourth attempt to do so.

We conclude that a substantial fine will have a deterrent effect, both upon the Mathieus and other property developers in Westford. We have taken this factor into consideration in determining the appropriate fine, as is recommended by 10 V.S.A. § 8010(b)(7).

Lastly, we have considered the Town's actual costs of noticing and enforcing this violation against both Mr. and Mrs. Mathieu, as is recommended by 10 V.S.A. § 8010(b)(6). Our per diem assessment has taken into account the length of time that Mr. and Mrs. Mathieu allowed this zoning violation to continue. See 10 V.S.A. § 8010(b)(8).

Mr. and Mrs. Mathieu acted cooperatively in creating and continuing this zoning violation; Mrs. Mathieu (at the very least) allowed her property to be used for the unpermitted access way and contributed to its maintenance and use. Mr. Mathieu, most likely with the help of others, constructed the road and used it for his personal gain: easier access to his barn. Both Mr. and Mrs. Mathieu hindered the Town's efforts to bring their respective properties in to compliance and presented aggressive defenses against the Town's enforcement complaint. Such is their right, although the consequence of failing to present convincing evidence in support of their defenses must be that they shoulder a significant portion of the resulting Town expenses.

For all these reasons (both mitigating and aggravating), we conclude that Mrs. Mathieu should be fined at the rate of **$25.67** per day for the 702 days that she caused or allowed this violation to continue. We conclude that Mr. Mathieu should be fined at the rate of **$43.00** for each of the 419 days that he caused or allowed this violation to continue. Because Mr. and Mrs. Mathieu acted together in committing this zoning violation, we conclude that they should be **jointly and severally liable**, for a total fine of **$18,020.00**.

These fine assessments are on the lower scale of the range of fines that we may impose ($0.00/day to $100.00/day). We have made these assessments, taking in to account the

relative seriousness of the violation, as well as the aggravating and mitigating factors detailed above.

We note that during certain periods of Mrs. Mathieu's 702 days of violation and Mr. Mathieu's 419 days of violation, there were periods of time when they were waiting for responses from Town representatives, the ZA, the Planning Commission, and the DRB. We would have reduced or eliminated the fines assessed for some of these time periods, but for the fact that the evidence revealed that Mr. and Mrs. Mathieu continued to construct the access way, use it, and allow others to use it. We therefore concluded that the more appropriate response to Mr. and Mrs. Mathieu's continued violation was to award a rounded per diem fine assessment against them and in favor of the Town.

b. **As to Mr. Mathieu alone:**

Mr. Mathieu was solely responsible for the following two continuing zoning violations: (1) occupancy and use of the barn on his property without first receiving a CO and continuing this zoning violation for a total of 696 days; and (2) failure and refusal to use Mathieu Road as the access way for the modular home on Richard's Lot, even though the Planning Commission directed him to do so.

i. **Use of Barn Prior to Obtaining CO:**

As to the barn occupancy without a CO, we do not regard this as a particularly egregious violation, since it did not cause a direct impact upon the public health, safety, or welfare. We are concerned, however, that this violation evidences Mr. Mathieu's continuing disregard for the zoning violations that his community has adopted.

The Town responded in a timely fashion to Mr. Mathieu's violations and did not cause any material delay. What delay was caused was mostly due to Mr. Mathieu's failure to adequately explain what he intended to use his barn for and when he planned to bring his use in to compliance.

Mr. Mathieu knew that he was only authorized to use his barn for the storage of hay and haying equipment, and that he should not begin using the barn before receiving a CO. Despite this knowledge, he began and continued to use his barn, for storage of hay and other personal property, long before receiving a CO. His unauthorized use continued for 696 days

-36-

after the First NOV issued to him directed him to stop and cure the violation. We regard these as aggravating factors. We also regard Mr. Mathieu's continued contribution to multiple zoning violations to be an aggravating factor.

Finally, we believe that an adequate, aggregate fine should be imposed, so as to provide a deterrent effect for those considering committing zoning violations that they may regard as less important. Our society relies largely upon a voluntary conformance to the land use laws that we have enacted. If we were not to impose a fine here with some import, we would encourage a disregard of zoning laws that may appear merely "technical" but which nonetheless protect the public health, safety, and welfare.

For all these reasons, we conclude that Mr. Mathieu should be fined at the rate of $7.50 per day for the 696 days that he used his barn without first receiving a Certificate of Occupancy, for a total fine of **$5,220.00**. These fines shall be due independent of the other fines assessed against Mr. Mathieu.

### ii. Failure to use Mathieu Road for Modular Home Access:

Competing explanations were offered at trial for how Mathieu Road was first suggested as an access for the modular home on Richard's Lot. Mr. Mathieu and his engineer suggested that it was never discussed at the 2008 Planning Commission hearing; the Town suggested that the idea came from Mr. Mathieu. We need not resolve that factual dispute, because it is undisputed that the Planning Commission approved the Mathieus' 2008 subdivision/site plan amendment application, conditioned upon Mathieu Road being the "sole access" to the modular home on the Bus Lot. Mr. Mathieu never provided a site plan showing an alternate access way. Mr. Mathieu failed to develop the driveway off of Mathieu Road and instead developed an alternate access road that was never approved by any Town board or commission.

This violation is a simple, minor one, but it evidences the same disregard by Mr. Mathieu for the importance of zoning regulations, as described above. We are perplexed as to why he allowed this violation to continue and why he did not develop the property as proposed. The VTrans suggestion that the alternate access way is a preferred route provides no

excuse for Mr. Mathieu's complete disregard for the condition imposed by the Planning Commission.

Mr. Mathieu did cure this violation more quickly than the others. We also note that the Town responded quickly to his inquiries and revised "as-built" application. We must take in to consideration that, while he was curing this violation, he used and allowed his brother to use an access way other than Mathieu Road. He had clear knowledge of the illegality of this violation and nonetheless allowed it to continue. Were we to allow this zoning violation to have been proved, yet impose no fine, it would suggest to others that land use regulations need not be respected.

For all these reasons, we conclude that a fine must be imposed against Mr. Mathieu and for the Town in the amount of $5.00 for each of the 98 days that he caused and allowed this zoning violation to continue, for a total fine of **$490.00**.

c. **As to Mr. Mathieu and Mathieu Properties:**

We now come to the last task before this Court: assessment of fines for the access road over the Bus Lot that was allowed by Mathieu Properties (as the property owner) and caused by Mr. Mathieu, for the benefit of the modular home on his adjoining Lot. Defendants had no authority to construct and use this alternate access way, and using it was in direct violation of a prior Planning Commission condition.

In the whole experience of zoning violations presented to this Court, this unauthorized access way is minor, and yet it evidences a disregard for the importance of honoring and respecting land use regulations. These Defendants cured this violation relatively quickly, but they allowed the violation to continue for 98 days beyond an extended cure period. This continuation was especially regrettable, since the cure only entailed tilling, seeding, and mulching soil. Nevertheless, Defendants chose not to complete that work for over three months.

For all the same reasons explained above, we impose a fine of $15.00 for each of the 98 days that Mathieu Properties and Richard Mathieu allowed this violation to continue. Mr. Mathieu and Mathieu Properties shall be jointly and severally liable to the Town for a total fine for this violation in the sum of **$1,470.00**.

## Conclusion

For all the reasons stated above, the Court imposes the following fines in favor of the Town of Westford:

a. Linda and Richard Mathieu shall be liable, jointly and severally for a total fine of **$18,020.00**;

b. Mr. Mathieu shall be liable for an additional fine of **$5,710.00**; and

c. Mr. Mathieu and Mathieu Properties shall be additionally liable, jointly and severally, for a total fine of **$1,470.00**.

The Town of Westford shall be entitled to recovery of fines in the total amount of **$25,200.00**

A Judgment Order accompanies this Merits Decision. This completes the current proceedings before this Court on these enforcement actions.


Electronically signed at Newfane, Vermont on June 9, 2014, pursuant to V.R.E.F. 7(d).


Thomas S. Durkin, Judge
Environmental Division